## MARGARET AKI MEDEIROS, ET AL. *v.*
## RALPH H. KIYOSAKI, ET AL.

No. 4918.

DECEMBER 14, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ.,
AND CIRCUIT JUDGE OKINO IN PLACE OF
KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY RICHARDSON, C.J.

Plaintiffs-appellants, residents of the City and County of Honolulu and parents of 5th and 6th grade children in the public school system, sought to enjoin the defendants-appellees, Ralph H. Kiyosaki, the State Superintendent of Education, the members of the State Board of Education, and Alice M. Doyle, Program Specialist of the Department

of Education, from continuing with a film series entitled "Time of Your Life." The film series was being shown in the 5th and 6th grade levels of the public school system as part of a newly adopted curriculum for family life and sex education. The plaintiffs based their action on the constitutional grounds that the program is an invasion of privacy and a violation of their religious freedom. Plaintiffs further alleged that the program was illegal because it was adopted by an improper delegation of authority by the State Board of Education to the administrative staff of the State Department of Education. The trial court dismissed the complaint and denied the request for injunctive relief.

Before turning to the issues involved in this appeal, a further description of the film series entitled "A Time of Your Life" is warranted. In 1968 the legislature approved the Department of Education's intent to devote resources toward the planning and programming of instruction in the area of social problems.[1] These problems included, but were not limited to, family living and sex education.[2] Pursuant to this legislative approval, the Superintendent of Education, as chief executive officer of the Department, upon the recommendation of his staff, selected the program "Time of Your Life." It was developed for and is successfully being used on instructional television in San Francisco, California. The program involved has been described as a "family living and sex education program" for the 5th and 6th grades and may be characterized as a sociophysiological educational program.[3] It consists of 15 lessons covering subject areas of interpersonal relationships, self-understanding, family structure and sex education. Lessons 1 through 10 are psychologically and sociologically

---

[1] House Conf. Comm. Rep. No. 3, p. 8 (1968 Budget Session, Hawaii State Legislature).

[2] *Supra.*

[3] Decision—Exhibit "A": Findings of Fact, p. 1, April 21, 1969.

oriented. Lessons 11 through 15 concern sexuality and sexual development. Each lesson consists of a twenty minute film designed for viewing over Educational Television. It is supplemented with preparatory and follow-up activities planned by the individual classroom teacher and is geared to the needs of the individual class. Although it is primarily lessons 11 through 15 to which plaintiffs object, they seek to enjoin the entire program for reasons of unconstitutionality and illegal delegation of power. Therefore, we turn first to the constitutional issues raised by this appeal.

## I. Constitutional Issues.

Plaintiffs contend that the basic and underlying issue of this case is whether parents are free to educate their offspring in the intimacies of sexual matters according to their own moral and religious beliefs without undue interference by the State. More specifically, they argue that the sex education program (hereinafter referred to as "Program") adopted by the State is unconstitutional because it unduly interferes with their right of privacy and freedom of religion.

## A. Right of Privacy.

There is no question that the citizens of this State have been afforded the specific right of privacy. Section 5 of Article I of our State Constitution provides that ". . . the right of the people to be secure . . . against invasions of privacy shall not be violated." And although the right of privacy is not specifically afforded in the First Amendment of the United States Constitution, the Supreme Court of the United States has held that the Amendment ". . . has a penumbra where privacy is protected from governmental intrusion." *Griswold* v. *Connecticut,* 381 U.S. 479, 483 (1968).

Plaintiffs cite *Griswold* v. *Connecticut, supra,* in support of their position. In *Griswold,* a Connecticut statute which made the use of contraceptives a criminal offense was held invalid as being an invasion of marital privacy. As stated by Justice Douglas in delivering the opinion of the Court at pages 485-86:

> The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the *use* of contraceptives rather than regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP* v. *Alabama,* 377 U.S. 288, 307. Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.

Thus, the Supreme Court held where the zone of privacy is invaded by the state by unnecessarily broad means, its action is in contravention of the First Amendment. Connecticut had forbidden the *use* of contraceptives rather than merely regulating their manufacture or sale. This interdiction, the Court held, was unnecessarily broad.

The question we now face is this: Can this State through its proper agencies adopt and initiate a curriculum of family life and sex education for use in the fifth and sixth grades without invading its citizens' constitutional right to privacy? We must not look to see if there has

been a possible or technical invasion of privacy but instead whether the government has by "unnecessarily broad means" contravened the plaintiffs' right of privacy.

The State in formulating policies for the adoption of the Program anticipated possible objections by parents and guardians of fifth and sixth grade children to the context of the film series, especially the treatment of the subject matter in lessons numbered 11 through 15.[4] The State therefore, established an "excusal system" whereby parents and guardians had the option of withholding or withdrawing their children from the Program by submitting a written excuse to the school. Furthermore, in order to allow parents and guardians an opportunity to view the 15 lessons of the film series before they were shown to their children at school, the lessons were shown each Monday evening at 10 p.m. on Educational Television. The Monday night telecasts enabled the parents to consider the content of the lesson and then submit a written excuse if they found it objectionable. We view this "excusal system" as an effort by the defendants to allow those parents or guardians who might object to the Program or parts thereof on moral or religious grounds to have their children excused. The Program was in no way compulsory, and, therefore, we cannot see how the State by "unnecessarily broad means" contravened plaintiffs' right of privacy.

Presumably in support of their invasion of privacy theory, plaintiffs cite two other cases: *Meyer* v. *Nebraska,* 262 U.S. 390 (1923), which upheld the rights of parents to have their children learn a foreign language, and *Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925), which upheld the rights of parents to have their children educated in

---

4 These lessons deal specifically with sexuality and sexual development. They are entitled as follows: Lesson 11—"The Male"; Lesson 12 —"The Female"; Lesson 13—"A New Life"; Lesson 14—"Questions, Please"; Lesson 15—"Growing Up."

private elementary schools. *Meyer* and *Pierce* are supportive of the explicit freedoms of speech and press rather than the penumbral right of privacy. Citing these two cases, the Supreme Court drew the following conclusion in *Griswold* v. *Connecticut, supra* at 482: "In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." Yet, this is the very thing that the plaintiffs would have this court do. They seek to "contract the spectrum of available knowledge" by enjoining the State from continuing with its family life and sex education program. In light of the *Griswold, Pierce,* and *Meyer* cases, we cannot, under the circumstances of this case, sustain plaintiffs' position that the Program should be enjoined on the basis that their constitutional right of privacy has been violated.

### B. Freedom of Religion.

We turn next to plaintiffs' contention that the Program in question is a violation of their First Amendment right of religious freedom. The First Amendment to the United States Constitution provides in relevant part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

The counterpart of the First Amendment is found in Article I, Section 3, of the Hawaii State Constitution.

Plaintiffs assert that the instant case basically involves a "free exercise of religion" situation in that the program enacted by the Department of Education is claimed to infringe upon plaintiffs' rights to educate their children in sexual matters pursuant to their particular religious beliefs. There was testimony by some parents that the Program violated basic religious and moral beliefs that they have instilled in their children. Other parents, however,

testified to the desirability of having the series continued and generally took views opposite to those of the plaintiffs. Clergymen from various faiths, including Catholic, Mormon, Baptist and independent Protestant groups testified that certain aspects of the series violated their religious beliefs and doctrines. On the other hand, clergymen of other faiths, including Episcopalian, Methodist, Buddhist, Presbyterians and other independent denominations testified that they saw no violation of religious or moral principles in the series.

It has been argued that *requiring* attendance at sex education courses would burden the free exercise of religion of those who honestly believe that exposure to certain subjects covered within those courses is sinful or that sex education must be accompanied by moral instruction.[5] However, in view of the fact that the program to which the plaintiffs now seek a permanent injunction is not compulsory, we fail to find any direct or substantial burden on their "free exercise" of religion.

Nevertheless, plaintiffs argue that availability of the "excusal system" is not constitutionally sufficient, citing *McCollum* v. *Board of Education,* 333 U.S. 203 (1948), and Justice Brennan's concurring opinion in *Abing-*

---

[5] *Recent Developments, The Constitutionality Under the Religion Clauses of the First Amendment of Compulsory Sex Education in Public Schools,* 68 Mich. L. Rev. 1050 (1970). "The free exercise clause has often been invoked by religious groups to gain exemptions from laws of general applicability." *Supra* at 1053. *See, e.g.,* Sherbert v. Verner, 374 U.S. 398 (1963) (which required South Carolina to carve out of its unemployment compensation laws an exemption for petitioner, a Seventh-Day Adventist, who refused on religious grounds to accept a job which required her to work on Saturdays) ; Martin v. City of Struthers, 319 U.S. 141 (1943) (concurring opinion of Murphy, J.. which held a municipal ordinance forbidding the distribution of handbills or circulars— as applied to a person distributing advertisements for a religious meeting—invalid under the Federal Constitution as a denial of freedom of religion) ; Murdock v. Pennsylvania, 319 U.S. 105 (1943) (which held a municipal ordinance that, as construed and applied, required colporteurs to pay a license tax as a condition to the pursuit of their activities, was invalid under the Federal Constitution as a denial of freedom of speech, press and religion).

*ton School Dist.* v: *Schempp,* 374 U.S. 203 (1963).[6] The *Schempp* case concerned Pennsylvania law requiring that at least ten verses from the Holy Bible should be read, without comment, at the opening of each public school day, and that any child shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian. Justice Clark, in delivering the opinion of the Court, held that the reading from the Holy Bible and the recitation of the Lord's Prayer were religious in character and were, therefore, *ipso facto,* violative of the Establishment Clause. As the Court pointed out at page 223: "The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." Inasmuch as plaintiffs have available the excusal system, they are under no direct governmental compulsion.

Furthermore, unlike the case at bar, both *McCollum* and *Schempp* involved the direct use of tax supported public school systems for *religious instruction,* and both were held to clearly violate the *Establishment Clause.* Our case is distinguishable in that we are asked to decide the constitutionality of a State-wide program of "family life and sex education" based upon a complaint that certain subjects covered therein are objectionable from a moral and religious standpoint.

Equally pertinent to our discussion is the Supreme

---

6 It should be noted that Justice Brennan's opinion was not shared by any other member of the Court while Justice Douglas took the opposite view. Justice Brennan reasoned that the evils inherent in the "excusal system" are just as much present regardless of whether the action complained of concerns Establishment or Free Exercise clauses. 374 U.S. 203, 288.

Justice Douglas in his concurring opinion reasons that the Free Exercise Clause "is written in terms of what the State may not require of the individual" and lack of any compulsion by the school district effectively disposes of any issue relating to the "free exercise" of religion. 374 U.S. 203, 227.

Court's holding in *Epperson* v. *Arkansas,* 393 U.S. 97 (1968), in which an Arkansas statute prohibiting the teaching of the Darwinian theory of evolution because such theory was contrary to the religious views of some of its citizens was held unconstitutional. At page 104 the Court stated:

> . . . Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief....

And at 106:

> There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma.

If we were to hold that the "family life and sex education" program adopted by the State is contrary to certain religious beliefs of some of our citizens and therefore unconstitutional on the grounds that it prevents the free exercise of their religion, we would come dangerously close to approving that which is prohibited by *Epperson.* We must be equally protective of the freedoms of speech, inquiry and belief as we are of the freedom of religion.

Inasmuch as we have found no compulsion or coercion related to the educational Program in question, we find no violation of the First Amendment's Free Exercise of Religion Clause.

## II. Improper Delegation of Authority.

Plaintiffs also seek reversal on the argument that the Program in question is illegal because it was adopted by an improper delegation of authority by the State Board of Education to the administrative staff of the State Department of Education. They argue that the Board of Educa-

tion's power is based upon law and since no legislative authority was granted for such a program, either the Board's action, or lack thereof, or defendant Ralph Kiyosaki's action in accepting and adopting this program was an unlawful delegation of power. In other words, plaintiffs contend that in order for curriculum dealing with family life and sex education to be used in the public school system, the State Board of Education must have specific authorization from the legislature before it can establish policies or adopt programs. We do not agree.

There is no question that the Board of Education, as the executive head of the State Department of Education, is granted broad discretionary powers in formulating and enacting educational programs for the State's public schools. Section 3 of Article IX of our constitution (as amended) provides:

> The board of education shall have power, in accordance with law, to formulate policy, and to exercise control over the public school system through its executive officer, the superintendent of education . . . .

The same language is incorporated into Section 296-2 of the Hawaii Revised Statutes pertaining to the powers of the Board and its Superintendent. The duties of the Superintendent are set out in Section 296-11 and read, in part, as follows:

> § 296-11 *Duties of superintendent.* Under policies established by the board of education, the superintendent of education shall administer programs of education and public instruction throughout the State, including education at the preschool, primary, and secondary school levels, health education and instruction, and such other programs as may be established by law.

The Program in question was adopted in response to the appropriation for the operating budget of the Department of Education for the fiscal year ending June 30,

1969, as set forth in a lump sum in Act 74, Session Laws of Hawaii 1968. With reference to such appropriation, *House Conf. Comm. Rep.* No. 3 (1968 Budget Session, Hawaii State Legislature) contains, *inter alia,* the following, on page 8:

10. *Program for instruction of social problems.* The rapidly expanding population, expanding and changing economy, and a change in social mores, are conditions which call for a program of instruction related to social problems. These problems include, but are not limited to, family living and sex education . . . . The department presently has a program offering courses in the area of social problems. However, this program is spotty and it has not been planned in a comprehensive fashion or programmed in a manner which would allow articulation of levels of expectation from the beginning to the terminal point of instruction. The Committee approves of the department's intent to devote resources toward the planning and programming of instruction in the area of social problems.

As the trial court correctly ruled, the cited passage indicates the legislative intent as to what direction sex education programs in the schools should take. Pursuant to such expressed intent, the Department of Education recommended for adoption the Program in question.

However, plaintiffs argue that even if such a program is deemed to be within the discretionary powers of the Board of Education or that there was a sufficient mandate by the legislature for the adoption of such program, there was, nevertheless, a clear abuse of such discretionary powers. Reference is again made by plaintiffs to HRS § 296-11, which states in relevant part: "Under policies established by the board of education, . . . the superintendent of education shall administer programs of education and public instruction throughout the State . . . ." The

plaintiffs contend that the Program was formally adopted before any policies were established by the Board of Education. There is no validity to such a contention since the actions of the administrative staff were merely recommendatory, the actual adoption being made by Superintendent Kiyosaki as executive officer of the Board. The Board meeting of January 9, 1969, reaffirmed the policy which Mr. Kiyosaki understood to be in effect at the time he adopted the program.

Affirmed.

*Samuel Landau* and *W. Patrick O'Connor* for appellants.

*George Pai* (*Bertram T. Kanbara,* Attorney General, and *Roy M. Miyamoto,* Deputy Attorney General, on the brief) for appellees.